**AFFIRM and Opinion Filed January 27, 2023**



**In The**

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00897-CV**

**IN THE INTEREST OF J.J.W., A CHILD**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-21-00672-X**

## MEMORANDUM OPINION

Before Justices Nowell, Carlyle, and Smith
Opinion by Justice Smith

Father and Mother appeal the trial court's order terminating their parental

rights to J.J.W. In a single issue, Father challenges the legal and factual sufficiency

of the evidence to support the trial court's finding that termination of his parental

rights was in the best interest of J.J.W. Counsel for Mother filed an *Anders* brief,

asserting that the record contains no reversible error. *See Anders v. Cal.*, 386 U.S.

738 (1967). We affirm the trial court's order.

## Background

In February 2021, the Texas Department of Family and Protective Services

(Department) received a referral alleging that Mother and Father were neglectful in

supervising J.J.W., who was four-years-old at the time. The Department conducted an investigation and, in July 2021, filed an original petition for termination of Mother's and Father's parental rights.

A bench trial commenced on June 14, 2022. Department caseworker Latisha Redman and Department supervisor Tonyia Brown testified for the Department, and Father testified on his own behalf.

Redman testified that the Department became involved due to drug use by both Mother and Father. J.J.W. was removed from his parents during the investigation. For a period, J.J.W. lived with his maternal grandparents but was removed after both grandparents tested positive for methamphetamine.[1] Thereafter, J.J.W. lived in a foster placement, where he progressed physically and emotionally. The Department believed J.J.W.'s foster parents were willing and able to meet his physical, emotional, and developmental needs moving forward.

Redman completed a family assessment, shaped family plan services, and set referrals. Mother successfully completed psychological services, but did not complete individual counseling, drug testing, or parenting classes. She had a negative urinalysis test in February or March 2022, but did not complete approximately eight other tests that Redman requested. She was inconsistent in attending visitations with J.J.W. The Department also did not know where Mother

---

[1] Mother provided, but the Department denied, some homes as alternatives to foster care placement.

had been living and had some concern that she might flee with J.J.W. According to Redman, Mother had a fairly lengthy record dating back several years and previously lost custody of two other children, who were being raised by a relative.

Father successfully completed psychological services, parenting classes, and individual counseling. He attended each of his visitations with J.J.W. and was responsive to Redman's requests for information. Father interacted well with J.J.W.; they seemed bonded.

Father, however, had a known history of drug abuse and, according to Redman, had not successfully complied with the Department's drug testing requirements. Although he had seven negative urinalysis tests, he tested positive for methamphetamine on three hair-strand tests. According to Redman, the discrepancy could indicate Father knew how to game the testing system. The Department had a high level of concern about returning J.J.W. to Father when the evidence did not show Father was sober.

After Father tested positive for methamphetamine in March or April 2022, Redman told Father that he needed another assessment and a recovery plan or sponsor. Father denied using drugs and thought he might have tested positive because he had sexual contact with Mother. Father believed Mother had used drugs in 2022, but was not sure if she had a "drug problem." Redman had advised both parents that they needed to change their environment, including their relationship, but they continued to have sexual contact while the case was pending. According to

Father, their relationship ended four or five months before trial. Redman testified that the Department believed Father's continued involvement with Mother reflected poorly on his decision-making and ability to protect J.J.W.

Father had an older son that had been the subject of a previous Department investigation and was being raised by relatives. Father admitting using methamphetamine during the previous investigation, but claimed that he was clean and ready to do what was needed now. He testified that he last used methamphetamine six to seven years ago with Mother and, at that time, he had a pretty substantial addiction. Father asserted that he had not used drugs during the present investigation, did not know why he tested positive, and had a negative drug test the Saturday before trial. Father advised that he was on the waitlist for an in-house treatment placement and requested additional time to undergo treatment.

At the time of trial, Father had been living with Barbara Evans for two months; he ran errands and did other chores for Evans in exchange for rent. Redman visited Evans's trailer, which was cluttered and not very clean. Evans also had a CPS record, but it did not indicate past child abuse. Father testified that he had lived in a duplex for the four to five months before he moved in with Evans. According to Redman, Father previously reported to her only that he was living in different hotels and stayed with a relative at one point.

Father worked at a distribution center. His take-home pay was $1,200 to $1,300 every two weeks, and he planned to lease an apartment for $950 per month.

The apartment was undergoing renovations at the time of trial. If J.J.W. were returned to him, Father would find a day care and take vacation or personal time until they got settled.

At the close of evidence, the trial court continued the trial to allow Father to obtain the results of his recent drug test. The trial reconvened on July 11, 2022, and Father presented evidence of a negative body-hair test.[2] Redman testified that, based on the results, the Department "re-staff[ed]" with regard to its previous position, but determined that its position remained the same. Noting Father's drug use was the critical issue, Redman cited his positive tests and maintained that the evidence did not show Father's sobriety.

Gustavo Murillo, a Department substance-abuse program specialist, explained that hair specimens collected from the body and the head have a different range of detection due to different growth and retention rates. According to Murillo, it is possible to have a negative body-hair test and a positive head-hair test. He advised caseworkers not to use body-hair testing because its results show historical, and not current, drug use.

At closing, both Mother and Father requested that J.J.W. be returned to Father. Ultimately, the trial court found that the evidence: (1) justified termination of Father's parental rights under Texas Family Code section 161.001(b)(1)(D) and

---

[2] Although the record indicates that trial was continued pending the results of a test Father took just prior to or on the date of trial, the lab report shows that the specimen tested was collected after trial was continued.

(E); (2) justified termination of Mother's parental rights under section 161.001(b)(1)(D), (E), and (O); and (3) established termination of Father's and Mother's parental rights was in J.J.W.'s best interest under section 161.001(b)(2). *See* TEX. FAM. CODE ANN. § 161.001(b).[3]  The trial court also made additional findings, including the following, on the record:

> These parents have a lengthy history of methamphetamine use, the father's sobriety is questionable at this time, he completed, for the most part, his services but he continued to test positive for methamphetamines during the duration of this case. I understand that he took that body hair test recently, but the testimony indicates that body hair could've gone back as much as a year.
>
> There seems to be some pretty poor judgment exercised from his part with respect to the relationship with the mother, and he seems to still even question whether she has a substance abuse problem. His housing situation is questionable, and I have some concerns about the stability of the housing.

Thereafter, the trial court signed a final order terminating Father's and Mother's parental rights.  This appeal followed.

---

[3]  As grounds for termination, section 161.001(b)(1)(D) requires that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," and subsection (E) requires that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).  Section 161.001(b)(1)(O) requires that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id*. § 161.001(b)(1)(O).

**Termination of Father's Parental Rights**

In a single issue, Father challenges the sufficiency of the evidence to support the termination of his parental rights. To involuntarily terminate the parent-child relationship, a trial court must find by clear and convincing evidence that: (1) one or more of the statutory grounds for termination enumerated in the family code has been established; and (2) termination is in the child's best interest. *Id.* § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Our standard of review on appeal reflects the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). Both legal and factual sufficiency reviews require us to review the evidence to determine whether the factfinder reasonably could have formed a firm belief or conviction that the grounds for termination were established. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). For legal sufficiency, we view all the evidence in the light most favorable to the finding. *Id.* We assume the factfinder resolved all factual issues in favor of the finding and disregard all disputed evidence to the contrary. *Id.* For factual sufficiency, we weigh the disputed evidence contrary to the finding and determine whether, in light of the entire record, the evidence that could not reasonably be credited in favor of the finding is so significant that it would prevent the formation of a firm belief or conviction that the finding is true. *Id.* at 631. In doing so, we are mindful not to

scrutinize the evidence to the point where "the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

While fully appreciating the "constitutional magnitude" afforded parental rights, we also recognize the imperative that we not sacrifice the "emotional and physical interests of the child . . . merely to preserve that right." *Id.* at 26. We also must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *A.B.*, 437 S.W.3d at 503 (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

In this case, Father challenges only the sufficiency of the evidence supporting the trial court's finding that termination was in J.J.W.'s best interest. *See* Fam. § 161.001(b)(2). "Best interest" is a term of art encompassing a broad facts-and-circumstances evaluation, and we accord the factfinder significant discretion in its best-interest determination. *In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *14 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.). There is a strong presumption that maintaining the parent-child relationship serves the child's best interest, Fam. § 153.131, but there also is a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest, *id.* § 263.307(a).

The supreme court has identified a nonexclusive list of factors potentially relevant to a best-interest determination, including: (1) the child's desires; (2) the child's current and future emotional and physical needs; (3) current and future emotional and physical dangers to the child; (4) the parental abilities of those seeking custody; (5) the programs available to help those individuals promote the child's best interest; (6) those individuals' plans for the child; (7) the home's or proposed placement's stability; (8) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The absence of evidence of some of the *Holley* factors does not preclude a finding that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27.

Father argues that he exhibited the proper parenting skills that would serve J.J.W.'s best interest. Additionally, he completed his court-ordered services and testified he had been employed for more than a year earning $17.50 an hour and was approved to rent an apartment after some repairs were completed. According to Father, after considering all the evidence in light most favorable to the Department, no reasonable trier of fact could form a firm belief or conviction that terminating his parental rights was in J.J.W.'s best interest. The Department responds that the trial court's best-interest finding was supported by legally and factually sufficient evidence. After reviewing the evidence in light of the *Holley* factors, we agree.

J.J.W. was six-years old at the time of trial and did not testify. Redman testified that J.J.W. loved Father and they seemed bonded. She also reported that J.J.W. liked his foster placement environment.

Appellant had worked at a distribution center for a little over a year. He planned to lease an apartment, but in the meantime had been living in Evans's travel trailer for about two months. If J.J.W. were returned to Father, Father planned to take vacation or personal time until he could arrange for J.J.W. to attend a daycare. The Department had concerns about Father's housing stability, noting that he had lived with Evans for only a short time and, before that, had not disclosed exactly where he was living.

In the event of termination, the Department planned for J.J.W. to be adopted by his current foster placement, which the Department believed was both willing and able to meet J.J.W.'s physical, emotional, and developmental needs. J.J.W. had progressed both physically and emotionally in the placement and was thriving academically and socially at school.

Father previously lost custody of another child following a Department investigation. During this case, he successfully completed psychological services, parenting classes, and individual counseling. But, his continued drug use and intimate association with Mother, also a drug user, suggests that he had not developed the parenting skills necessary to provide J.J.W. with a safe and stable living environment. *See, e.g.*, *In re B.L.H.*, 609 S.W.3d 271, 282 (Tex. App.—

–10–

Texarkana 2020, pet. denied) ("[Mother's] excuse that she could have tested positive after release from rehab because she was having intercourse with a man that was using copious amounts of methamphetamine only served to emphasize her poor decision making.").

A child's need for permanence through the establishment of a "stable, permanent home" is a paramount consideration in the best-interest determination, *see In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.), and the factfinder may compare a parent's plans to the Department's plans to determine which are realistic. *In re J.D.*, 436 S.W.3d 105, 119–20 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Here, the trial court reasonably could have concluded that J.J.W.'s current and future needs, including the need for a stable, permanent home, Father's parenting abilities, and his and the Department's plans for J.J.W. weighed in favor of termination.

Father had a history of drug abuse and, although he had several negative urinalysis tests, he continued to test positive on hair strand tests while this termination proceeding was pending. With respect to his negative test after the continuance, Murillo testified that, because body-hair test results show historical drug use, it was possible to have both a negative body-hair test and a positive head-hair test.

A parent's drug use supports a finding that termination is in the best interest of the child, and the factfinder can give "great weight" to the parent's drug-related

conduct. *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *K.C.*, 219 S.W.3d at 927). To the extent there was conflicting evidence regarding Father's continued drug use, the trial court, as factfinder, was charged with resolving the conflict. *See, e.g.*, *In re Z.L.W.*, No. 01–12–00736–CV, 2013 WL 396270, at *2, 5 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (Mother's later negative drug tests did not undermine her earlier positive results when evidence showed the earlier test "used a more sophisticated testing technique and reflected a different period of time than the later tests"). Based on this record, the trial court reasonably could have concluded that Father's drug use posed a continuing risk of physical and emotional danger to J.J.W. that weighed in favor of termination.

Viewing the evidence, both in the light most favorable to the trial court's finding and as a whole, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in J.J.W.'s best interest. Accordingly, we conclude that the evidence is both legally and factually sufficient to support the trial court's best interest finding. *See* FAM. § 161.001(b)(2). We overrule Father's sole issue.

### Termination of Mother's Parental Rights

Mother's court-appointed counsel filed an *Anders* brief, concluding after a diligent review of the record that Mother's appeal is frivolous and without merit. *See In re D.D.*, 279 S.W.3d 849, 849–50 (Tex. App.—Dallas 2009, pet. denied)

(citing *Anders*, 386 U.S. 738). Counsel provided Mother a copy of the brief and informed Mother of her right to examine the record and file her own response. The Clerk of this Court also provided Mother, at her last known address, a copy of the *Anders* brief and informed her of her right to file a pro se response, but it was returned as "unable to forward." As of this date, the Court has not received a response, or a change in address, from Mother.

The procedures outlined in *Anders* apply in termination of parental rights cases. *D.D.*, 279 S.W.3d at 850. In reviewing *Anders* briefs, we do not review the merits of each claim raised in the brief or in a pro se response. *Id.* (citing *Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005)). Instead, we determine whether there are any arguable grounds for reversal, and if there are, we remand the case for new counsel to be appointed. *Id.*

Here, the *Anders* brief presents a professional evaluation of the record explaining why there are no arguable grounds for reversal. Counsel explained the factual background of the case, and concluded, after diligently reviewing the record and the applicable law, that the appeal was frivolous and without merit. We have independently reviewed the record and counsel's brief and agree the appeal is frivolous and without merit. We find nothing in the record that could arguably support the appeal.

**Conclusion**

We affirm the trial court's order terminating Mother's parent-child relationship with J.J.W. and Father's parent-child relationship with J.J.W.

/Craig Smith/
CRAIG SMITH
JUSTICE

220897F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.J.W., A CHILD,

No. 05-22-00897-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-21-00672-X.
Opinion delivered by Justice Smith. Justices Nowell and Carlyle participating.

In accordance with this Court's opinion of this date, the trial court's Final Decree Order of Termination on Judgement on Verdict of Court is **AFFIRMED**.

Judgment entered this 27th day of January 2023.